1  BRADFORD K. NEWMAN (SB# 178902) bradfordnewman@paulhastings.com
   SHANNON S. SEVEY (SB# 229319) shannonsevey@paulhastings.com
2  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   5 Palo Alto Square
3  Sixth Floor
   Palo Alto, CA  94306
4  Telephone:  (650) 320-1800
   Facsimile:  (650) 320-1900
5
   Attorneys for Plaintiff
6  ArcSoft Inc.

ORIGINAL
FILED

JUL - 6 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  ARCSOFT INC.,                        CASE NO. C07-03512 SC

13              Plaintiff,               **DECLARATION OF TONIE BERRYMAN
                                         IN SUPPORT OF ARCSOFT INC.'S
14      vs.                              APPLICATION FOR TEMPORARY
                                         RESTRAINING ORDER**
15  PAUL FRIEDMAN,

16              Defendant.               Date:   July 6, 2007
                                         Time:   9:30 a.m.
17                                       Dept:   Courtroom 1, 17th Floor
                                         Bef:    The Hon. Samuel Conti
18

19

20

21

22

23

24

25

26

27

28

1    I, TONIE BERRYMAN, declare as follows:

2        1.      I am the Manager of Human Resources of ArcSoft Inc. ("ArcSoft" or the

3    "Company") and have held this position since 2003. I have personal knowledge of the facts

4    contained herein, and if called as a witness, I could and would testify competently thereto.

5        2.      I have worked for ArcSoft for approximately seven and one-half years. Prior to

6    being the Manager of Human Resources, I was the Senior Business Administrator for ArcSoft,

7    being responsible for Human Resources, benefits and other administrative and personnel matters.

8        3.      ArcSoft is a leading provider of innovative digital imaging technologies and

9    multimedia solutions for device manufacturers. Specifically, ArcSoft designs, manufactures and

10   markets proprietary products that increase users' ability to work with digital photos, video and

11   music. ArcSoft's tools and technologies range from image enhancements and video editing to

12   printing and DVD authoring, for desktop, mobile, and embedded technologies.

13       4.      ArcSoft hired Paul Friedman on or about April 19, 2004 as its Vice President,

14   Mobile Group. In this position, Friedman managed the sales personnel for the mobile group, with

15   approximately four sales persons reporting to him worldwide. I am informed he holds a degree in

16   Computer Science and understand him to be computer savvy.

17       5.      On or about January 1, 2007, as part of a corporate reorganization, Friedman's title

18   was changed to Vice President and General Manager, Europe. In his new position, Friedman's

19   responsibilities included acquiring and managing ArcSoft's relationship with two major mobile

20   OEM accounts in Europe, and the mobile telephone service providers in Europe. Friedman's

21   duties also included assisting the Chief Executive Officer in developing customer relations and

22   strategies and negotiating selected business contracts for ArcSoft's key corporate OEM customers

23   and partners. Friedman also had regular meetings with ArcSoft's Vice President and General

24   Manager for Research and Development, during which he learned highly sensitive information

25   regarding ArcSoft's plans for the development of new products. Friedman also made

26   presentations to ArcSoft's Board of Directors to inform the Board of the Company's progress in

27   the mobile arena and strategies for new product development.

28       6.      As a high-ranking employee of ArcSoft, and in connection with his role as the

1   manager of the mobile sales personnel, Friedman had access to a wide variety of confidential,

2   proprietary, and trade secret information of ArcSoft, including (1) product road maps (including

3   ArcSoft's plans for new developments in the mobile area), (2) confidential customer information

4   (including customer demands, customer pricing terms and agreements, customer specifications,

5   and detailed presentations to key customers containing proprietary product information),

6   (3) confidential information regarding the revenue generated and received by ArcSoft's mobile

7   division, as well as forecasted revenue and bookings, (4) information regarding the compensation

8   of sales employees, and (5) internal budgets for the mobile division.  Specifically, I am informed

9   that as a member of ArcSoft's mobile division, Friedman had regular access to confidential and

10  proprietary engineering specifications for all of ArcSoft's approximately 50 mobile products.

11          7.      Friedman was also personally involved in several agreements that ArcSoft

12  reached with key mobile customers, and was therefore privy to the specific and confidential

13  technical specifications and deal terms of such agreements.

14          8.      As a condition to ArcSoft granting Friedman access to its confidential,

15  proprietary, and trade secret information, and as a term and condition of his employment,

16  Friedman executed and agreed to abide by several agreements pertaining to the protection of its

17  confidential, proprietary, and trade secret information.

18          9.      On or about April 27, 2004, shortly after joining ArcSoft, Friedman executed the

19  Company's standard Employee Confidentiality Agreement, a true and correct copy of which is

20  attached hereto as Exhibit A.  In this agreement, Friedman acknowledged that ArcSoft's

21  proprietary and trade secret information includes such items as product development information,

22  revenue and financial information, customer and sales information, employee compensation data,

23  and other information not generally known to the public, and he agreed that he would return and

24  not retain, use, or disclose ArcSoft's proprietary and trade secret information following the

25  termination of his employment and/or upon request.

26          10.     Friedman also executed and agreed to abide by ArcSoft's Company Property

27  policy, which states that items such as computer equipment, data stored on ArcSoft computers,

28

1  and client and customer lists belong to ArcSoft and must be returned to ArcSoft upon the

2  termination of Friedman's employment.  A true and correct copy of this policy is attached hereto

3  as Exhibit B.

4      11.    Friedman also executed ArcSoft's Computer, E-Mail And Internet Use Policy,

5  through which Friedman acknowledged that "All computers, computer files, e-mails and/or

6  software provided for employee use remain the sole property of ArcSoft."  A true and correct

7  copy of this policy is attached hereto as Exhibit C.

8      12.    As an additional measure to protect its confidential and proprietary information,

9  ArcSoft trains its employees regarding their obligation to protect ArcSoft's proprietary

10  information both during and after their employment with ArcSoft.  For example, in 2006, all

11  employees, including Friedman, underwent "IT Training" and "Protecting ArcSoft" training,

12  through which ArcSoft instructed its employees regarding the importance of safeguarding and not

13  improperly using or disclosing ArcSoft's confidential and proprietary information.  True and

14  correct copies of the attendance sheets bearing Friedman's signature are attached hereto as

15  Exhibit D.

16      13.    Throughout his approximately three years of employment with ArcSoft, and based

17  on information he learned pursuant to his employment with ArcSoft and contact with ArcSoft's

18  customers, Friedman had access to detailed technical information about all of ArcSoft's

19  approximately 50 mobile products and the specifications and modifications it makes to those

20  produces for its customers.  I am informed and believe, because I was copied on many emails

21  over the course of his employment, that Friedman maintained confidential and proprietary

22  information in emails – and their attachments – stored on his company laptop.

23      14.    Friedman also maintained a list of ArcSoft customers that contained confidential

24  information of ArcSoft, including the names of ArcSoft's mobile customers and specific contact

25  persons within these customers.  I am personally familiar with this customer list because

26  Friedman occasionally sent me copies of the list (or portions of the information contained therein)

27  that the customers on the list could receive an ArcSoft Christmas card.  It is my understanding

28  that Friedman maintained this list on his Company-issued laptop computer.

1      15.    On Tuesday, June 26, 2007, I went to Friedman's office and asked him to join
2  Michael Deng, ArcSoft's Chief Executive Officer, and me in a conference room. I observed
3  Friedman sitting in his office with his feet on his desk. He had a small, silver-colored laptop on
4  his lap, which I recognized as the laptop ArcSoft had issued to him in connection with his
5  employment. When Friedman said he would meet with Deng and me momentarily, I proceeded
6  to the conference room.

7      16.    A few minutes later, Friedman entered the conference room. After I informed
8  Deng that Friedman was there, Deng came in and proceeded to inform Friedman that his position
9  with the Company was being eliminated. After Friedman demanded to know the reasons for his
10 termination, Deng explained that, due to Friedman's failure to generate European sales revenue,
11 ArcSoft could no longer justify the cost of his position. Deng also explained that, although
12 Friedman's performance had not met expectations, ArcSoft wished to offer Friedman severance
13 in the amount of three months of Friedman's salary and benefits.

14     17.    Friedman responded with words to the effect that he "did not accept" his
15 termination, that the severance offer was "totally unacceptable" and that he would not accept
16 "anything less than two years of pay and benefits." Friedman also stated that, if the Company did
17 not agree to pay him (a three-year employee) severance in the amount of two years of Friedman's
18 salary and benefits, he was going to make it "very unpleasant for [Deng], ArcSoft, the
19 Shareholders and the Board of Directors, and you don't even want to go down that path."

20     18.    In response, Deng stated that he understood that Friedman wanted a larger
21 severance package, but that he felt three months of severance pay and benefits was fair.

22     19.    Friedman then urged Deng to "carefully consider" what he was doing, stating
23 words to the effect that "if you wish to proceed down this path, it is going to get very expensive
24 for ArcSoft and I guarantee it." Deng then responded by explaining that he had already given it a
25 great deal of thought and that his decision was final.

26     20.    Friedman then demanded his final paycheck. Deng told Friedman that I had
27 paperwork prepared for him regarding his final paycheck and other termination-related matters,
28 and that I would go over this paperwork with him in an exit interview (which is standard practice

1  at ArcSoft). Friedman replied that he did not have to go over anything with me and had no
2  intention of doing so. Friedman stood up and began leaving the room, stating that he would be
3  back momentarily.

4       21.    While waiting for Friedman to return, and concerned by the behavior he had
5  demonstrated, I attempted to contact Rob Mjaseth, Operations Manager, to ask him to secure
6  Friedman's office (meaning to ensure that the laptop and other ArcSoft property that Friedman
7  had in there was secure). However, Mjaseth did not answer his telephone. As I was attempting to
8  locate him, I looked out of the window and saw Friedman in the parking lot. He was carrying a
9  brown leather bag (approximately the size of a briefcase) and was walking toward his car. When
10  he returned from his car, he no longer had this bag with him.

11      22.    While Friedman was outside, I met with Mjaseth and Matt Williams, Customer
12  Service Manager outside of Friedman's office. I informed them that Friedman had left the
13  building and asked them to go into Friedman's office and confirm whether any ArcSoft property
14  was missing. After looking around, Mjaseth informed me that Friedman's ArcSoft laptop was no
15  longer in his office. As I had seen the laptop computer in Friedman's office only fifteen minutes
16  earlier, I became concerned that the laptop computer was in the bag I saw Friedman take to his
17  car.

18      23.    I then instructed Mjaseth and Williams to shut off Friedman's access to ArcSoft's
19  computer network, so that he could no longer access his ArcSoft email account or any
20  information stored on ArcSoft's computer network.

21      24.    After meeting with Mjaseth and Williams, I observed Friedman re-enter ArcSoft's
22  offices. I then proceeded to the conference room where we had met earlier and attempted to
23  complete the exit interview documentation with him. I presented Friedman with his final
24  paycheck (which included his wages through that day and his accrued and unused vacation),
25  which he accepted. However, Friedman refused to sign any of the paperwork ArcSoft had
26  prepared for his exit interview. In particular, Friedman refused to sign ArcSoft's standard
27  Confidentiality Agreement for Terminating Employees, a true and correct copy of which is
28  attached hereto as Exhibit E. This agreement serves to remind employees such as Friedman of

1   their obligation to protect and not retain, use, or disclose ArcSoft's confidential, proprietary, and

2   trade secret information after they leave ArcSoft. After Friedman refused to sign this agreement,

3   I reminded him that he was still bound by the terms of the confidentiality agreement and policies

4   he executed upon joining ArcSoft.

5         25.    I then reminded Friedman that all non-public technical information, business

6   information, strategic information, customer lists, and customer contact information, and other

7   proprietary information in his possession belonged to ArcSoft, and that he was obligated to return

8   all copies of this information to ArcSoft before leaving the premises. I also asked him to provide

9   the Company with an update regarding his recent meetings with ArcSoft's customers. In

10  response, Friedman chuckled, which I interpreted as an indication he would not provide the

11  information ArcSoft requested.

12        26.    I then asked Friedman if he had any questions. He indicated that he did not but

13  asked to speak to Deng alone. When Deng insisted I stay in the room, Friedman pointed to me

14  and said words to the effect of "Fine, but I am telling you now, you had better contact your

15  attorney and the insurance company." When I asked him on what grounds I would need to call

16  them, he told me "just nevermind."

17        27.    Friedman then went to his office to gather his personal effects. While he was

18  doing so, I went to inform Deng that I believed Friedman had taken his Company-issued laptop

19  and put it in his car. Deng told me that if Friedman did not return the laptop, I should call the

20  police.

21        28.    I then went to Friedman's office and asked him if he had taken his ArcSoft-issued

22  laptop. When Friedman admitting to taking it, I informed him that he needed to return the laptop

23  or I would have no choice but to call the police. Friedman responded with words to the effect that

24  the laptop "is the only thing [he had] to leverage with," that he wanted to talk to Deng by himself,

25  and that he would return the laptop "in good time." After communicating to Deng Friedman's

26  request to speak with him, I informed Friedman that Deng would not speak with him again and

27  reiterated that if he did not return ArcSoft's laptop, I would call the police. Mr. Friedman said

28  that was "fine."

1

2      29.    Based on Friedman's repeated refusals to return ArcSoft's laptop, I asked Mjaseth

3   to call the police, which he then did, while I and Williams stood outside of Friedman's office and

4   observed him gathering his things.

5      30.    Once Friedman finished gathering his personal effects, Williams and Friedman

6   proceeded outside. While they were outside, I learned from Mjaseth that the police were on their

7   way to ArcSoft's offices. Since I knew that Friedman was leaving, I went outside to write down

8   the license plate number on his car and to ask whether Friedman intended to ever return ArcSoft's

9   laptop computer. In response, Friedman stated words to the effect of, "Of course I will." Based

10  on this statement, I thought Friedman had reconsidered his refusal to return ArcSoft's laptop

11  (since he knew I had instructed Mjaseth to call the police). However, a few minutes later, after I

12  had returned inside, Mjaseth informed me that Friedman left without returning the laptop.

13     31.    When the police arrived, I met with Fremont Police Officer Chad Bosques and

14  explained to him what had occurred. I then observed Officer Bosques call Friedman on his

15  cellular telephone (approximately ten minutes after Friedman left ArcSoft's premises), identify

16  himself, and ask Friedman to immediately return the laptop since it was ArcSoft's property.

17  Officer Bosques informed Friedman that if he did not return the laptop, he could be arrested for

18  Grand Larceny, which Officer Bosques explained is a felony, and that he would contact the

19  Berkeley police and have them arrest Mr. Friedman at his home.

20     32.    After communicating this information to Friedman, Officer Bosques handed the

21  telephone to me, apparently after Friedman asked to speak with me. Officer Bosques asked me to

22  speak calmly to Friedman, since he was, in Bosques' opinion, acting in an agitated manner.

23  Bosques also communicated that Friedman had claimed to be concerned for his safety, since

24  ArcSoft had purportedly had "two large men" escort him out of the building. (This statement

25  surprised me, since the only reason Williams and Mjaseth walked to Friedman's car with him was

26  to help him carry his personal items to his car – items which Friedman could not have carried by

27  himself.)

28     33.    When I picked up the telephone, I noticed that Friedman's voice was raised, and I
    agreed with Officer Bosques' assessment that Friedman appeared to be agitated. Friedman asked

1   me if he could keep ArcSoft's laptop overnight and bring it back in the morning so he could have

2   his personal files removed from it. I told him that if he brought the laptop back immediately, I

3   would arrange to have ArcSoft's IT Department remove all of his personal files while he waited.

4   Friedman did not agree to this, and again requested that ArcSoft allow him to keep the laptop

5   until the following day. I informed Friedman that the return of ArcSoft's laptop was not

6   negotiable and that he needed to return it immediately.

7       34.     I then handed the telephone back to Officer Bosques, who proceeded to try for a

8   second time to negotiate the return of the laptop. Officer Bosques even offered to remain at

9   ArcSoft's facilities while Friedman returned the laptop computer to address Friedman's stated

10  concerns regarding his personal safety. Officer Bosques also told Friedman that he felt ArcSoft

11  was being very reasonable in its offer to copy his personal files from the ArcSoft laptop,

12  explained that the contents of the laptop are the property of ArcSoft, and even noted that he had

13  probably signed a confidentiality agreement (like Friedman did) had when he joined the police

14  department. Shortly thereafter, the call ended.

15      35.     After Bosques hung up the telephone, I told him that the laptop itself was not

16  ArcSoft's primary concern, but rather it was the proprietary information contained in the laptop

17  that was of serious concern to ArcSoft. I explained that, if the contents were downloaded, deleted

18  or destroyed, it could cause significant harm to ArcSoft. Officer Bosques then asked me to

19  explain what kind of information was on the laptop and asked for Friedman's contact

20  information. When I returned with Friedman's contact information – which reflected that

21  Friedman's residence is not located in the City of Fremont, Officer Bosques told me that in

22  addition to the Grand Larceny charge, Friedman would also be charged with embezzlement for

23  taking the contents of the laptop.

24      36.     Officer Bosques gave me his card and then departed. Attached hereto as Exhibit F

25  is a true and correct copy of the business card Officer Bosques gave to me. I have requested a

26  copy of the police report but have not yet received it from the Fremont Police.

27      37.     At approximately 5:16 pm that evening, approximately six hours after taking

28  ArcSoft's laptop from ArcSoft's premises, Friedman sent me an email stating that the laptop was

1    available to be picked up at his home. A true and correct copy of this email is attached hereto as

2    Exhibit G. Friedman's statement that we could pick the laptop up at his home in Berkeley did not

3    make sense to me because Friedman could have turned around and returned the laptop when the

4    police officer and I repeatedly asked him to do so several hours earlier, or he could have returned

5    it to our offices later in the day, or he could have returned it to one of our homes that evening or,

6    if he was uncomfortable facing us, he could have had a friend or relative return it. Friedman's

7    use of email exchanges to prolong his return of the laptop was troubling and confusing, since

8    Friedman could have returned the laptop at any point after leaving ArcSoft's offices, as urged by

9    both the police and by me. At that point, it was clear to me that Friedman had succeeded in

10   stealing the laptop and having unfettered and unsupervised access to it for several hours. Since he

11   had earlier told me and the police officer that his intent was to access data on it, I assumed he had

12   completed doing whatever he was so intent on doing that he had disobeyed the directive of a

13   police officer who had instructed him to return the laptop several hours earlier and who had

14   informed Friedman that his actions constituted a felony.

15       38.     By this point, I felt that we had done everything we could, including involving the

16   police, to cause Friedman to return the laptop in the same manner in which he stole it. Friedman

17   appeared to be trying to create email evidence – several hours after the fact and after disobeying a

18   police officer and my repeated requests – that he was somehow voluntarily agreeing to return the

19   computer, but not immediately. I felt like this was also an attempt to further delay returning the

20   laptop through email exchanges, rather than simply returning it to us as requested. I responded by

21   asking Friedman to make arrangements to have the laptop returned to ArcSoft the first thing the

22   next morning (June 27, 2007), along with any other ArcSoft property he still possessed. A true

23   and correct copy of this email is attached hereto as Exhibit H.

24       39.     At approximately 9:51 p.m. that evening, Friedman responded to my email and

25   offered to bring the laptop – which by this point had been in his possession for hours -- to

26   ArcSoft's offices the next day. Friedman emailed again the following day, June 27, 2007, at 8:31

27   a.m. True and correct copies of these emails are attached as Exhibits I and J.

28

40.     At approximately 2:45 p.m. on June 27, 207, Friedman telephoned me and asked how he should return the laptop computer to ArcSoft. After placing him on hold, I asked for his telephone number and informed him that Victor Chen, Corporate Counsel for ArcSoft, would return his call shortly.

41.     Approximately fifteen minutes later, Chen called Friedman using a speakerphone. Friedman was informed that I was present during this telephone call, and I heard the conversation between Chen and Friedman. Friedman stated he had been "trying" to return the laptop computer to ArcSoft since the telephone conversation with Officer Bosques. When Chen asked if ArcSoft could send a courier to retrieve the laptop, Friedman suggested that he bring it to ArcSoft himself, but then ultimately agreed to allow a courier to come to his home. Friedman gave Chen his home address and requested that the courier also deliver his expense reimbursement check and the portion of the severance dispute (i.e. three months of his salary and benefits) that was not in dispute. In response, Chen informed him that he was only calling to discuss the return of the laptop computer and that he was not involved in the other circumstances concerning the termination of his employment.

42.     Chen also asked whether Friedman intended to condition the return of the laptop on his receipt of the items he was requesting. Friedman indicated that the only condition he would place on the return of the laptop was that he wanted a letter from ArcSoft stating that he had returned the laptop, and stated that he felt it "would be better" if he came to either ArcSoft or the local Marriott hotel to return the laptop (rather than allowing a courier to come to his home to retrieve it). When Chen informed Friedman that ArcSoft would prefer to send a courier rather than have Friedman return to ArcSoft's offices, Friedman suddenly stated that he did not want a courier to come to his home. He ultimately agreed to meet at the Marriott hotel in Fremont later that day.

43.     I am informed that, at approximately 4:22 p.m. on June 27, 2007, Friedman met with Victor Chen, Corporate Counsel for ArcSoft, and Anthony Adion at the Fremont Marriott Hotel to return his Company-issued laptop to ArcSoft.

44.     At approximately 4:25 p.m., I received a telephone call from Friedman.  Friedman stated that he had returned the laptop computer, charger, and cellular telephone that ArcSoft had issued to him.

45.     During the period that Friedman was employed, he informed me that his wife and brother in law are both attorneys.

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct.  Executed on this 5th day of July, 2007, in Fremont, California.

3    

4                                                    Tonie Berryman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## Employee Confidentiality Agreement

In consideration of my employment with ArcSoft, Inc. (the "Company") and the compensation hereafter paid to me, I agree as follows:

1. Company's Trade Secrets. I understand that in the performance of my job duties with the Company, I will be exposed to the Company's trade secrets. "Trade secrets" means information or material that is commercially valuable to the Company and not generally known to the industry. This includes:

(a) any and all versions of the Company's proprietary computer software and web site development (including source code and object code), hardware, firmware and documentation;

(b) technical information concerning the Company's products and services, including product data and specifications, diagrams, flow charts, drawings, test results, know-how, processes, inventions, research projects and product development;

(c) information concerning the Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, advertising strategies, supplier lists and supplier information;

(d) information concerning the Company's employees, including their salaries, strengths, weaknesses and skills;

(e) information submitted by the Company's customers, suppliers, employees, shareholders, consultants or investors with the Company for study, evaluation or use; and

(f) any other information not generally known to the public that, if misused or disclosed, could reasonably be expected to adversely affect the Company's business.

2. Non-disclosure of Trade Secrets. I will keep the Company's trade secrets, whether or not prepared or developed by me, in the strictest confidence. I will not use or disclose such secrets to others without the Company's written consent. However, I shall have no obligation to treat as confidential any information which:

(a) was in my possession or known to me, without an obligation to keep it confidential, before such information was disclosed to me by the Company;

(b) is or becomes public knowledge through a source other than me and no fault of mine; or

(c) is or becomes lawfully available to me from a source other than the Company.

3. Confidential Information of Others. I will not disclose to the Company, use in the Company's business, or cause the Company to use, any information or material that is a trade secret of others. My performance of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me prior to my employment by the Company.

4. No Conflicting Obligations. I have no current or prior agreements, relationships or commitments that conflict with this Agreement.

5. <u>Return of Materials</u>. When my employment with the Company ends, for whatever reason, I will promptly deliver to the Company all originals and copies of all documents, records, software programs, html code, media and other materials containing any of the Company's trade secrets. I will also return to the Company all equipment, files, software programs and other personal property belonging to the Company.

6. <u>Confidentiality Obligation Survives Employment</u>. I understand that my obligation to maintain the confidentiality and security of the Company's trade secrets remains with me even after my employment with the Company ends and continues for so long as such material remains a trade secret.

7. <u>Works Made for Hire</u>. I understand that as part of my job duties I may be asked to create, or contribute to the creation of, computer programs, web site development, documentation and other copyrightable works. I agree that any and all computer programs, web sites, documentation and other copyrightable materials that I am asked to prepare or work on as part of my employment with the Company shall be "works made for hire" and that the Company shall own all the copyright rights in such works. IF AND TO THE EXTENT ANY SUCH MATERIAL DOES NOT SATISFY THE LEGAL REQUIREMENTS TO CONSTITUTE A WORK MADE FOR HIRE, I HEREBY ASSIGN ALL MY COPYRIGHT RIGHTS IN THE WORK TO THE COMPANY.

8. <u>Disclosure of Developments</u>. While I am employed by the Company, I will promptly inform the Company of the full details of all my inventions, discoveries, improvements, innovations and ideas (collectively called "Developments"), that I conceive, complete or reduce to practice (whether solely or jointly with others) and which:

    (a) relate to the Company's present or prospective business, or actual or demonstrably anticipated research and development;

    (b) result from any work I do using any equipment, facilities, materials, trade secrets or personnel of the Company; or

    (c) result from or are suggested by any work that I may do for the Company.

9. <u>Assignment of Developments</u>. I hereby assign to the Company or the Company's designee, my entire right, title and interest in all of the following, that I conceive or make (whether alone or with others) while employed by the Company:

    (a) all Developments;

    (b) all copyrights, trade secrets, trademarks and mask work rights in Developments;

    (c) all patent applications filed and patents granted on any Developments, including those in foreign countries.

10. <u>Execution of Documents</u>. Both while employed by the Company and afterwards, I agree to execute and aid in the preparation of any papers that the Company may consider necessary or helpful to obtain or maintain any patents, copyrights, trademarks or other proprietary rights at no charge to the Company, but at its expense.

11. <u>Power of Attorney</u>. If the Company is unable to secure my signature on any document necessary to obtain or maintain any patent, copyright, trademark or other proprietary rights, whether due to my mental or physical capacity or any other cause, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to execute and file such documents and do all other lawfully permitted acts

to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed by me.

12. <u>Prior Developments</u>. As a matter of record, I have identified below all prior Developments ("Prior Developments") relevant to the subject matter of my employment by the Company that have been conceived or reduced to practice or learned by me, alone or jointly with others, before my employment with the Company, which I desire to remove from the operation of this Agreement. The Prior Developments consist of: M/M Sin
I represent and warrant that this list is complete. If there is no such list, I represent that I have made no such Prior Developments at the time of signing this Agreement.

13. <u>Conflict of Interest</u>. During my employment by the Company, I will not engage in any business activity competitive with the Company's business activities. Nor will I engage in any other activities that conflict with the Company's best interests.

14. <u>No Diversion of Company Business</u>. For a period of 12 months from the date my employment ends, I will not divert or attempt to divert from the Company any business the Company enjoyed or solicited from its customers during the six months prior to the termination of my employment.

15. <u>Non-interference with Company Employees</u>. While employed by the Company and for 12 months afterwards, I will not:

(a) induce, or attempt to induce, any company employee to quit the Company's employ;

(b) recruit or hire away any Company employee; or

(c) hire or engage any company employee or former employee whose employment with the Company ended less than one year before the date of such hiring or engagement.

16. <u>Enforcement</u>. I agree that in the event of a breach or threatened breach of this Agreement, money damages would be an inadequate remedy and extremely difficult to measure. I agree, therefore, that the Company shall be entitled to an injunction to restrain me from such breach or threatened breach. I further agree that Company shall be entitled to a writ of possession for any Company property that I retained after my employment. Any action to enforce this Agreement may be brought in either the state or federal courts of Alameda County and I submit to the personal jurisdiction of these courts.

17. <u>General Provisions</u>.

(a) <u>Successors</u>. The rights and obligations of this Agreement shall survive the termination of my service to the Company in any capacity and shall inure to the benefit and shall be binding upon my heirs and personal representatives.

(b) <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of California.

(c) <u>Severability</u>. If any provision of this Agreement is determined to be invalid or unenforceable, the remainder shall be unaffected and shall be enforceable against both the Company and me.

(d) <u>Entire Agreement</u>. This Agreement supersedes and replaces all former agreements or understandings, oral or written, between the Company and me on the subject matter of this Agreement.

(e) Modification. This Agreement may not be modified except by a writing signed both by the Company and me.

(f) Assignment. This Agreement may be assigned by the Company, however I may not assign or delegate my duties under this Agreement without the Company's prior written approval.

I have carefully read and considered all provisions of this Agreement and agree that all of the restrictions set forth above are fair and reasonably required to protect the Company's interests. I acknowledge that I have received a copy of this Agreement as signed by me.

Dated: 27APR04                     By: _____
                                       PAUL FRIEDMAN
                                       (Type or Print Employee's Name)

Dated: 4-27-04                     By: _____
                                       Tonie Berryman
                                       (Type or Print Name of Company Rep)
                                   Title: H. R. Manager

# EXHIBIT B



## *Company Property*

ArcSoft will supply to its employees, the necessary equipment, materials and supplies required to perform their job.

All equipment, materials and supplies purchased by or received from customers, vendors or suppliers and issued to employees, remain the property of ArcSoft.

Employees are responsible for items issued to them including without limitation:

- ✓ Computer Equipment including printers, scanners, digital cameras, PDA's etc.
- ✓ All data stored on company issued computers
- ✓ Company Products
- ✓ Client & Customer Lists
- ✓ Company Cards (credit cards, purchasing cards, security cards, calling cards etc.)
- ✓ Keys
- ✓ Manuals
- ✓ Pagers, Cellular Phones, Fax Machines etc.
- ✓ Protective Equipment
- ✓ Tools
- ✓ Written Materials

Employees must return all ArcSoft property upon request or upon termination of employment.

By signing below, employee understands and agrees to abide by ArcSoft's Company Property policy.

_____          27 APR 04
Signature of Employee                     Date

# EXHIBIT C



# Computer, e-mail and Internet Use Policy

The use of any ArcSoft computers, computer files, software, e-mail or the Internet on company time is restricted to legitimate business purposes within the scope of employment. To ensure compliance with this policy, all computers, e-mails and Internet use may be monitored. ArcSoft also retains the right to inspect all computers and their contents at its own discretion, at any time, with or without notice. Incidental personal use of ArcSoft computers, e-mail and the Internet will be tolerated only during non-business hours, provided this privilege is not abused. Employees have no general expectation of privacy in any computer, computer files, software, e-mail or Internet use on ArcSoft computers. Employees are required to provide ArcSoft with all passwords or other access codes used on any computer equipment or company property.

ArcSoft strives to maintain a workplace free of harassment and sensitive to the diversity of its employees. Therefore, ArcSoft prohibits the use of computers, e-mail and the Internet in ways that are disruptive, offensive to others or harmful to morale. For example, the display or transmission of sexually explicit images, messages and cartoons is not allowed. Other such misuse includes, but is not limited to, ethnic slurs, racial comments, off-color jokes or anything that may be construed as harassment or showing disrespect for others. Employees should notify their manager and/or the Human Resource Manager upon learning of violations of this policy. Employees who violate this policy will be subject to disciplinary action up to and including termination of employment. All computers, computer files, e-mails and/or software provided for employee use remain the sole property of ArcSoft.

_____    _____
Employee Signature                 Date

_____
Print Name

# EXHIBIT D

# IT Update Sign In
## 20-Dec-05

| LAST NAME | FIRST NAME | Signature |
|---|---|---|
| Adion | Anthony | |
| Amato | David | |
| Berryman | Tonie | |
| Cao | Jiangen (David) | |
| Castro | Celeste | |
| Chen | Qinggen (Chris) | |
| Chen | Shu (Roy) | |
| Choy | Wing Huen (Hess) | |
| Cote | Stephan | |
| David | Don | |
| Downs | Michael | |
| Feng | Liangkui (Frank) | |
| Friedman | Paul | |
| Hsu | Vincent | |
| Kim | Lilia | |
| Lam | David | |
| Lei | Bin | |
| Lin | Chien-Yu (Selina) | |
| Liu | Melissa | |
| Looi | Esther | |
| Luo | Hengbin | |
| Mao | Kaixuan (Shawn) | |
| Masuda | Takahiko | |
| Mjaseth | Robert | |
| Mu | Moon Keming | |
| Mulqueen | Kevin | |
| Mulqueen | Michael | |
| Pagenel | Patricia | |
| Price | Andrew | |
| Sales | Samuel Jr. | |
| Shang | Lumin | |
| Su | Yingfeng | |
| Sun | June | |
| Swensen | Larry | |
| Tanner | Jason | |
| Taodi | | |
| Tomijima | Minoru | |
| Tu | Howard | |
| Wang | Yan (Annie) | |
| Williams | Matthew | |
| Wong | Daniel | |
| Wu | Jian (Nathan) | |
| Xu | Sheng (Victor) | |
| Yang | Xiaoqiang (Kevin) | |
| Zhao | Zhengang (Daniel) | |
| Zulueta | Lisa | |

FY 2006 IT Update Sign In 12.20.05



*Training Topic:*    **Protection of Assets**

Attendees:

| Print Name | Signature |
|---|---|
| Michael Downs | Michael Downs |
| HONG TRAN | Hong Tran |
| DAN SALMONSEN | *(signature)* |
| PAUL FRIEDMAN | *(signature)* |
| IAN XIE | *(signature)* |
| ANTHONY AGION | Anthony A. |
| Celine Yeh | Celine Yeh |
| Michael V. | Michael van der Zwerg |
| *(crossed out signature)* | |
| Silvia Campbell | Lili Campbell |
| Daniel Wong | Daniel Wong |
| Hess Choy | *(signature)* |
| Sheng Xu | |
| Takahiko Masuda | Takahiko Masuda |
| Larry Swanson | *(signature)* |
| JAY KUO | Jay Kuo |
| NIRANJAN AVADHANAM | A. Niranjan |

# EXHIBIT E



## Confidentiality Agreement for Terminating Employees

In connection with the termination of your employment with ArcSoft Inc., I would like to remind you of the Employee Confidentiality Agreement you signed on your date of hire as a condition of your employment with ArcSoft. This agreement remains in effect even after employment with the Company ends. The protection of confidential business information and trade secrets is vital to the interests and the success of ArcSoft.

During the term of your employment with ArcSoft, you may have had access to and become acquainted with information of a confidential, proprietary or secret nature which is or may be either applicable or related to the present or future business of ArcSoft, its research and development or the business of its customers. The Confidentiality Agreement includes but is not limited to:

1. Company's Trade Secrets.

    (a) any and all versions of the Company's proprietary computer software and web site development (including source code and object code), hardware, firmware and documentation;

    (b) technical information concerning the Company's products and services, including product data and specifications, diagrams, flow charts, drawings, test results, know-how, processes, inventions, research projects and product development;

    (c) information concerning the Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, advertising strategies, supplier lists and supplier information;

    (d) information concerning the Company's employees, including their salaries, strengths, weaknesses and skills;

    (e) information submitted by the Company's customers, suppliers, employees, shareholders, consultants or investors with the Company for study, evaluation or use; and

    (f) any other information not generally known to the public that, if misused or disclosed, could reasonably be expected to adversely affect the Company's business.

2. Non-disclosure of Trade Secrets.

    (a) to keep the Company's trade secrets, whether or not prepared or developed by you, in the strictest confidence.
    (b) not to use or disclose such secrets to others without the Company's written consent.

3. Return of Materials. To promptly deliver to the Company all originals and copies of all documents, records, software programs, html code, media and other materials containing any of the Company's trade secrets. To also return to the Company all equipment, files, software programs and other personal property belonging to the Company.

4. <u>Works Made for Hire</u>.  You may have been asked to create, or contribute to the creation of, computer programs, web site development, documentation and other copyrightable works.  You have agreed that any and all computer programs, web sites, documentation and other copyrightable materials that you may have prepared or worked on as part of your employment with the Company shall be "works made for hire" and that the Company shall own all the copyright rights in such works.

5. <u>Assignment of Developments</u>.  You have agreed to assign to the Company or the Company's designee, your entire right, title and interest in all of the following, that you may have conceived or made (whether alone or with others) while employed by the Company:

      (a) all Developments;

      (b) all copyrights, trade secrets, trademarks and mask work rights in Developments;

      (c) all patent applications filed and patents granted on any Developments, including those in foreign countries.

6. <u>No Diversion of Company Business</u>.  For a period of 12 months from the date your employment ends, you have agreed not to divert or attempt to divert from the Company any business the Company enjoyed or solicited from its customers during the six months prior to the termination of your employment.

7. <u>Non-interference with Company Employees</u>.  While employed by the Company and for 12 months afterwards, your agreed not to:

      (a) induce, or attempt to induce, any company employee to quit the Company's employ;

      (b) recruit or hire away any Company employee; or

      (c) hire or engage any company employee or former employee whose employment with the Company ended less than one year before the date of such hiring or engagement.

It is not the intention of ArcSoft to interfere in your plans by preventing you from using your general skills and ability, or from using information that is in the public domain.  However, it is the policy of ArcSoft to protect its major assets.

If you have any questions regarding the foregoing, please contact the Human Resources Manager of ArcSoft Inc.

_Tonie Berryman_
Human Resources Manager

ArcSoft Inc
Company

Date: _6 / 26 / 2007_

..................................................................................................................
**Notice Acknowledgment**

I received a copy of this notice on ___ / ___ / ___    Signed _____   06 / 26 / 20

witness by

# EXHIBIT F



CITY OF
# Fremont

Chad Bosques, #2792
*Police Officer*

c)4&8 - 7946

*Police Department*
2000 Stevenson Blvd., P.O. Box 5007, Fremont, CA 94537-5007
510 790-6800 *ph* | www.fremontpolice.org

# 070626038

# EXHIBIT G

**From:** Paul Friedman [mailto:paul-friedman@sbcglobal.net]
**Sent:** Tue 6/26/2007 5:16 PM
**To:** Michael Deng; Tonie Berryman
**Subject:** the pc is available for you to pick up any time you want at my home

the pc is available for you to pick up any time you want at my home.  otherwise, i could bring
it down tomorrow.  let me know your preference.


- paul

# EXHIBIT H

----- Original Message ----
From: Tonie Berryman <tberryman@arcsoft.com>
To: Paul Friedman <paul-friedman@sbcglobal.net>; Michael Deng <mdeng@arcsoft.com>
Sent: Tuesday, June 26, 2007 6:28:36 PM
Subject: RE: the pc is available for you to pick up any time you want at my home

Paul,

I will make arrangements first thing in the morning to have a courier pick up the laptop to deliver to us. In addition, below is the additional property we have listed in your possession. Please arrange for these items to also be picked up at the same time.

Nokia Pro Developer Kit 6680, s/n 357062006555550
Motorola Motokrzr, s/n 353023015662930
Key for your office door

In addition, as I mentioned during the exit process, we need to have all of your customer lists and contact information and an update to the status of any recent meetings and business dealings.

If you have any outstanding expense reports, please send them to my attention for processing.

Regards,
Tonie

From: Paul Friedman [mailto:paul-friedman@sbcglobal.net]
Sent: Tue 6/26/2007 5:16 PM
To: Michael Deng; Tonie Berryman
Subject: the pc is available for you to pick up any time you want at my home

the pc is available for you to pick up any time you want at my home. otherwise, i could bring it down tomorrow. let me know your preference.

- paul

# EXHIBIT I

----- Original Message ----
From: Paul Friedman <paul-friedman@sbcglobal.net>
To: Tonie Berryman <tberryman@arcsoft.com>; Michael Deng <mdeng@arcsoft.com>
Sent: Tuesday, June 26, 2007 9:51:01 PM
Subject: Re: the pc is available for you to pick up any time you want at my home

michael and tonie,

i'll be down that way tomorrow. i can give you the pc, moto phone and key. (i do not have any other phones.) you cut off my phone service while we were speaking about it today, so returning the equipment was never resolved. otherwise, we need to coordinate the time for a courier pick-up here in berkeley. there is no one at home most of the time.

unfortunately, i have no working cell phone now. so, it is difficult to communicate with you, and i am missing a lot of personal calls. can we arrange to have my old cell number 'released' by arcsoft so i can have it transfered to a new account that i'll set up?

i think i already submitted all of my expense reports. i think one is still unpaid.

- paul

----- Original Message ----
From: Tonie Berryman <tberryman@arcsoft.com>
To: Paul Friedman <paul-friedman@sbcglobal.net>; Michael Deng <mdeng@arcsoft.com>
Sent: Tuesday, June 26, 2007 6:28:36 PM
Subject: RE: the pc is available for you to pick up any time you want at my home

Paul,

I will make arrangements first thing in the morning to have a courier pick up the laptop to deliver to us. In addition, below is the additional property we have listed in your possession. Please arrange for these items to also be picked up at the same time.

Nokia Pro Developer Kit 6680, s/n 357062006555550
Motorola Motokrzr, s/n 353023015662930
Key for your office door

In addition, as I mentioned during the exit process, we need to have all of your customer lists and contact information and an update to the status of any recent meetings and business dealings.

If you have any outstanding expense reports, please send them to my attention for processing.

Regards,
Tonie

---

**From:** Paul Friedman [mailto:paul-friedman@sbcglobal.net]
**Sent:** Tue 6/26/2007 5:16 PM
**To:** Michael Deng; Tonie Berryman
**Subject:** the pc is available for you to pick up any time you want at my home

the pc is available for you to pick up any time you want at my home.  otherwise, i could bring
it down tomorrow.  let me know your preference.


- paul

# EXHIBIT J

----- Original Message ----
From: Paul Friedman <paul-friedman@sbcglobal.net>
To: Tonie Berryman <tberryman@arcsoft.com>; Michael Deng <mdeng@arcsoft.com>
Sent: Wednesday, June 27, 2007 8:30:06 AM
Subject: Re: the pc is available for you to pick up any time you want at my home

please double check this, but i believe the company must pay me all uncontested amounts on my last day. that would include the expense report and the uncontested portion of the severance package. otherwise, the clock keeps ticking and the company would owe me for any additional days until i'm paid.

how can i access any personal voice messages left on my number? some of them may be critical. could we transfer the number off the arcsoft account to an account i pay?

do you want me to bring the pc, etc, to the office? i will not be at home most of the day. how do you want to coordinate this?

- paul

----- Original Message ----
From: Paul Friedman <paul-friedman@sbcglobal.net>
To: Tonie Berryman <tberryman@arcsoft.com>; Michael Deng <mdeng@arcsoft.com>
Sent: Tuesday, June 26, 2007 9:51:01 PM
Subject: Re: the pc is available for you to pick up any time you want at my home

michael and tonie,

i'll be down that way tomorrow. i can give you the pc, moto phone and key. (i do not have any other phones.) you cut off my phone service while we were speaking about it today, so returning the equipment was never resolved. otherwise, we need to coordinate the time for a courier pick-up here in berkeley. there is no one at home most of the time.

unfortunately, i have no working cell phone now. so, it is difficult to communicate with you, and i am missing a lot of personal calls. can we arrange to have my old cell number 'released' by arcsoft so i can have it transfered to a new account that i'll set up?

i think i already submitted all of my expense reports. i think one is still unpaid.

- paul

----- Original Message ----
From: Tonie Berryman <tberryman@arcsoft.com>
To: Paul Friedman <paul-friedman@sbcglobal.net>; Michael Deng <mdeng@arcsoft.com>

Sent: Tuesday, June 26, 2007 6:28:36 PM
Subject: RE: the pc is available for you to pick up any time you want at my home

Paul,

I will make arrangements first thing in the morning to have a courrier pick up the laptop to deliver to us. In addition, below is the additional property we have listed in your possession. Please arrange for these items to also be picked up at the same time.

Nokia Pro Developer Kit 6680, s/n 357062006555550
 Motorola Motokrzr, s/n 353023015662930
 Key for your office door

In addition, as I mentioned during the exit process, we need to have all of your customer lists and contact information and an update to the status of any recent meetings and business dealings.

If you have any outstanding expense reports, please send them to my attention for processing.

Regards,
Tonie

---

**From:** Paul Friedman [mailto:paul-friedman@sbcglobal.net]
**Sent:** Tue 6/26/2007 5:16 PM
**To:** Michael Deng; Tonie Berryman
**Subject:** the pc is available for you to pick up any time you want at my home

the pc is available for you to pick up any time you want at my home.  otherwise, i could bring it down tomorrow.  let me know your preference.


- paul